```
Rebecca Owen
P.O. Box 970211
Orem, Utah 84097
Telephone: 801.580.2925
Email: owen.rebecca.mpa@gmail.com
```

FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
JUN 18 2025
GARY P. SERDAR
CLERK OF COURT
BY _____ DEPUTY CLERK

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| REBECCA OWEN,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF UTAH LEGISLATIVE SERVICES, A GOVERNMENT ENTITY; DEBBIE CRAGUN, AN INDIVIDUAL; LEE A. KILLIAN, AN INDIVIDUAL; JOHN Q. CANNON, AN INDIVIDUAL; VICTORIA ASHBY, AN INDIVIDUAL; AND THE LEGISLATIVE STAFF MANAGEMENT COMMITTEE, A DIVISION OF THE UTAH STATE LEGISLATURE;<br><br>Defendants | Case No.:<br><br>VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES<br><br>Case: 2:25-cv-00485<br>Assigned To : Romero, Cecilia M.<br>Assign. Date : 6/18/2025<br>Description: Owen v. State of Utah Legislative Services et al |

PLAINTIFF REBECCA OWEN (hereinafter "PLAINTIFF") brings this Action against STATE OF UTAH LEGISLATIVE SERVICES ("LS"), DEBBIE CRAGUN ("CRAGUN"), LEE A. KILLIAN ("KILLIAN"), JOHN Q. CANNON ("CANNON"), VICTORIA ASHBY ("ASHBY"), and the LEGISLATIVE STAFF MANAGEMENT COMMITTEE ("LSMC"), (collectively "DEFENDANTS"), alleging violations of the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act of 1967 (ADEA), corresponding state law provisions, provisions of Utah State Law, and all of them, as follows:

PARTIES

1. Plaintiff is a citizen of the United States and is currently a resident of Utah County, Utah. At all times relevant hereto, Plaintiff resided in Salt Lake County, Utah, was known by the name Rebecca Long Smyrniotopoulos, was an individual with one or more disabilities as defined in the Americans with Disabilities Act, and was over the age of 40.

2. Defendant LS is a staff agency within the legislative branch of Utah State Government, and is and at all times relevant hereto, was located and operated within the State of Utah.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 1

3. Defendant Cragun is an individual who was, at all times relevant hereto, employed by Defendant LS as Legislative Services Administrator. Plaintiff is informed and believes that Cragun's employment with LS was involuntarily terminated on or around September 16, 2024.

4. Defendant Killian is an individual who is, and was at all times relevant hereto, employed by the State of Utah, Office of Legislative Research & General Counsel ("OLRGC") as Managing Staff Attorney.

5. Defendant Cannon is an individual who is, and was at all times relevant hereto, employed by OLRGC as Director.

6. Defendant Ashby is an individual who is, and was at all times relevant hereto, employed by OLRGC as Legislative General Counsel.

7. Defendant LSMC is and was at all relevant times hereto, a 6-member committee formed to oversee and manage all operations of the nonpartisan staff which supports the legislative branch of Utah State Government. The members of LSMC include those individuals who at any given time occupy the following jobs: Director, OLRGC; Legislative Auditor General; Legislative Fiscal Analyst; Legislative General Counsel; Chief of Staff of the Utah Senate; and Chief of Staff of the Utah House of Representatives. At all times relevant hereto, these jobs were occupied by, and LSMC was thus comprised of, Defendant Cannon, Kade R. Minchey ("Minchey"), Jonathan Ball ("Ball"); Defendant Ashby, Mark Thomas ("Thomas"), and Abby Osborne ("Osborne").

8. Plaintiff is informed and believes, and thereon alleges, that each and all Defendants were and are intentionally, negligently, or otherwise responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries and damages as herein alleged were directly and proximately caused by their individual and collective negligent and unlawful conduct.

## JURISDICTION AND VENUE

9. Jurisdiction is specifically conferred on this Court by, and equitable and other relief are sought, under the following:

    a. 42 U.S.C. §§ 12101 et seq.;

    b. 42 U.S.C. §§ 12112 et seq.;

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 2

    c.    42 U.S.C. §§ 12203 et seq.;

    d.    42 U.S.C. §§ 2000(e)(3) et seq.;

    e.    29 U.S.C. §§ 621 et seq.;

    f.    Corresponding laws of the State of Utah of each and all of the above;

    g.    Utah Code §§ 34-28-3 et seq.

10. Venue is proper before this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because the unlawful employment practices alleged herein were committed within the District of Utah, and each and all of the Defendants reside or may be found in this judicial district. Additionally, Plaintiff was employed in and a resident of this district at all relevant times, and the events giving rise to Plaintiff's claims occurred here.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Plaintiff has exhausted her administrative remedies in that:

    a.    Plaintiff was discharged from employment on December 15, 2023;

    b.    Plaintiff timely filed a Charge of Discrimination against LS with the Utah Antidiscrimination and Labor Division ("UALD") on or about February 22, 2024;

    c.    Plaintiff received a "Notice of Right to Sue" from the Phoenix District Office of the U.S. Equal Employment Opportunity Commission on March 21, 2025;

    d.    This Action is filed with the Court on June 18, 2025, the 88th day following Plaintiff's receipt of the "Notice of Right to Sue"; and

    e.    This Action is filed more than 60 days after Plaintiff filed the Charge of Discrimination.

## STATEMENTS OF FACT

12. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

13. Plaintiff began her employment with LS as Senior Human Resources Generalist on or about January 28, 2020. Plaintiff remained in this job throughout her employment with LS, although Plaintiff's job title was

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 3

changed to Senior Human Resources Consultant in July 2023. At all times relevant hereto, the education and/or professional experience required, and the scope of responsibility of Plaintiff's job were equivalent to those of a Deputy Human Resources Director.

14. At all times relevant hereto, Cragun was Plaintiff's direct supervisor. The education and/or professional experience required and the scope of responsibility of Cragun's job were equivalent to those of a Human Resources Director.

15. During the entirety of Plaintiff's employment with LS, up to and including the week her employment was involuntarily terminated, Plaintiff regularly received uniformly positive feedback regarding her exemplary job performance, her diligence, her professional effectiveness, and the breadth and depth of her subject-matter expertise. This feedback was received from legislative branch staff leadership and managers, other employees within her department, other staff within the legislative branch, and legislators. Plaintiff further received during this time two highly positive annual performance reviews; each and every merit-based annual salary increase available to legislative staff; at least one substantial cash bonus; and at least one "offcycle" salary increase, the last of which was awarded in late November 2023 just days prior to Plaintiff's involuntary termination. Each of these and all of these recognized the value of Plaintiff's professional contributions.

16. Throughout the course of her employment with LS, Plaintiff was consistently and appropriately transparent regarding the ongoing medical treatment for and efforts to self-manage symptoms of medical conditions with which Plaintff has been diagnosed. In particular, Plaintiff most openly shared details that were directly or indirectly relevant, or potentially relevant, to Plaintiff's work performance or attendance with Cragun and the third member of the legislative branch's human resources team, a staff-level Human Resources Generalist.

17. Throughout 2020 and 2021, Cragun was consistently supportive of Plaintiff both professionally and personally. Cragun regularly expressed praise for Plaintiff's work performance and subject-matter expertise. Their working relationship was collegial and positive, and, until mid-2022, Plaintiff never received any indication from Cragun that her job performance was in question or that any concerns existed regarding her abilities.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 4

18. In early 2022, after Plaintiff had been transparent about ongoing medical treatment and the possible impacts of her disabilities within the work environment, Plaintiff disclosed to Cragun and the HRG that the well-publicized national shortage of certain medications used to treat Attention Deficit Hyperactivity Disorder (ADHD) in children and adults had rendered Plaintiff unable to fill needed prescriptions. Plaintiff disclosed this information so that in the event one or both of Plaintiff's closest colleagues noticed changes in Plaintiff's working style, particularly in the late afternoon on work days, they would understand the reason for those changes.

19. Following this disclosure, in the spring of 2022, Cragun's behavior towards Plaintiff began to change. This shift marked a stark departure from Cragun's prior unwavering support for and professionalism towards Plaintiff, and coincided with the onset of the conduct that Plaintiff alleges constituted discrimination and retaliation under federal and state law.

20. During a meeting between Cragun and Plaintiff in May 2022, Cragun's hostility towards Plaintiff became unmistakable and undeniable. Cragun scheduled this meeting to discuss with Plaintiff feedback regarding Plaintiff's job performance from legislative branch managers with whom Plaintiff regularly worked. Most of this feedback was exceptionally positive. Cragun then went on to repeat a small handful of complaints Cragun had supposedly received. None of these complaints related to the quality, the comprehensiveness, or the timeliness of Plaintiff's work product; instead they were wholly based on personal traits directly related to Plaintiff's disabilities. Plaintiff found these complaints to be sophomoric and inconsequential. Because Cragun had, up until shortly before this meeting, been so reliably supportive of Plaintiff professionally and personally, and had regularly and emphatically assured all LS employees who were directly and indirectly supervised by Cragun that Cragun "had y(our) backs", Plaintiff attempted to explain Plaintiff's "side of the story" in response to each of these petty complaints. Cragun refused to accept either Plaintiff's explanations or Plaintiff's attempts to add necessary context, and in fact went on to spend more than an hour informing Plaintiff that Plaintiff should learn to "be a better communicator" and "manage her time better", among other vague and subjective directives.

21. A few weeks after the May 2022 meeting, during or about mid-June 2022, Plaintiff received a written annual performance review from Cragun that, while not at all reflective of Plaintiff's ongoing and

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 5

consistent high-caliber job performance, was not overly negative. It contained almost no reference to the May 2022 discussion. Shortly after receiving this performance review, Plaintiff received notice from Cragun that Plaintiff would receive the maximum available merit increase to Plaintiff's salary starting July 1, 2022.

22. Over the following 12 months, it became increasingly obvious to Plaintiff that Cragun was seeking out and even creating opportunities to continue criticizing Plaintiff about traits that are directly related to Plaintiff's disabilities; specifically, time management, general organizational skills, attention to minute detail, and brevity in verbal and written communication. These criticisms were made both privately and in the presence of other employees within LS who reported directly or indirectly to Cragun. When made in private, Cragun's tone and manner were accusatory, overly critical, and aggressive. When made in the presence of others, Cragun's criticisms were typically delivered as "jokes" made at Plaintiff's expense. Because Plaintiff was determined not to allow Cragun's severe and pervasive harassment to visibly affect Plaintiff while in the presence of others, Plaintiff would "laugh off" these "jokes", make a brief acknowledgement and explanation of what Plaintiff would immediately do to mitigate or resolve the underlying issue, and then quickly change the subject of discussion.

23. During this time Cragun on occasion openly praised others for the same or similar traits about which Cragun criticized and harassed Plaintiff.

24. Numerous other employees who witnessed Cragun's behavior towards Plaintiff regularly approached Plaintiff privately to express concern and empathy for Plaintiff's distress. Each witness made clear to Plaintiff that they interpreted Cragun's actions to be efforts to single out, intimidate, embarrass, and harass Plaintiff.

25. In May 2023, Cragun scheduled another meeting with Plaintiff for the same purpose as the May 2022 meeting. The content of the May 2023 meeting was essentially identical to the earlier one, and, during it, out of sheer desperation to be relieved of Cragun's ongoing harassment, Plaintiff reminded Cragun directly, in plain language, that Plaintiff had been diagnosed with ADHD and was prescribed the generic equivalent of Adderall. Plaintiff further reminded Cragun that Plaintiff had recently been unable to purchase enough of this medication to be able to use it daily as prescribed due to the national shortage, and that this was the

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 6

reason certain of Plaintiff's personal traits had become more noticeable, particularly late in the day. Finally, Plaintiff reminded Cragun that none of these complaints were at all related to missing, incomplete, or otherwise unacceptable work produced by Plaintiff; the complaints were solely about certain of the way(s) in which Plaintiff accomplished her work. Much to Plaintiff's shock, Cragun was unmoved and appeared to Plaintiff to consider this information irrelevant and unnecessary.

26. From July 1, 2022 through June 30, 2023, Ball was the Chair of LSMC and as such was the most senior leader within the legislative branch staff. The Chair of LSMC has and had during all relevant times herein, ultimate responsibility for oversight of all legislative staff operations and final decisionmaking. The Chair of LSMC was further the de facto direct supervisor of Cragun, and therefore the most appropriate manager to whom Plaintiff could report Plaintiff's concerns about Cragun's behavior.

27. On Friday, May 26, 2023, Plaintiff and Ball spoke by telephone for over an hour regarding the events of the previous 12 months. During this call, Ball was extremely receptive to Plaintiff's concerns and empathetic towards Plaintiff's distress. Ball assured Plaintiff that Plaintiff was a highly valued member of the legislative staff and that he was eager to take steps to return Plaintiff's work environment to one of civility and professionalism. Ball specifically told Plaintiff during this call that, should Plaintiff submit a request for reasonable accommodation, *he would personally ensure that any such accommodation was approved and put into place.*

28. Plaintiff received her annual performance review from Cragun or or about June 14, 2023. During the meeting held to deliver this review, Cragun's manner towards Plaintiff was hostile, demeaning, and humiliating. In another act of desperation to escape Cragun's harassment, Plaintiff informed Cragun that Plaintiff had made Ball aware of Plaintiff's workplace concerns. Cragun then immediately told Plaintiff not to sign the printed copy of Plaintiff's performance review because Cragun wanted to make edits before finalizing it. At this, Plaintiff reasonably believed Cragun would remove all references to traits directly related to Plaintiff's disabilities.

29. When Plaintiff received the updated version of the performance review from Cragun a few days later, Plaintiff was chagrined to realize it was substantially unchanged.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 7

30. Though the performance review did not accurately reflect Plaintiff's ongoing superior job performance, Plaintiff nonetheless received a substantial merit-based increase to her salary for July 1, 2023.

31. During the entirety of her employment with LS, Plaintiff was the designated ADA Coordinator for the legislative branch of Utah State Government for all employees except those in human resources positions. For human resources employees, one of whom was Plaintiff, Defendant Killian would act as ADA Coordinator.

32. Plaintiff began her human resources career in 2001. At no time between 2001 and 2023 had Plaintiff ever submitted any request for reasonable accommodation to any of her employers, as Plaintiff's ongoing medical care combined with Plaintiff's efforts to self-manage her symptoms had consistently and effectively enabled Plaintiff to perform the essential functions of each and every job Plaintiff held.

33. Within days of the June 14, 2023 meeting with Cragun, Plaintiff requested a meeting with Killian for the purpose of discussing Plaintiff's intent to submit a request for reasonable accommodation. Because Plaintiff's job description did not include any indication that the traits about which Cragun was criticizing Plaintiff were essential functions of Plaintiff's job, Plaintiff sought clarification on what, in fact, were and were not essential functions of Plaintiff's job.

34. Because Plaintiff's job description had been written by Cragun, and due to the hostile work environment Cragun had perpetuated on the basis of Plaintiff's disabilities, Plaintiff did not consider Cragun the appropriate individual from whom to seek clarification about the essential functions of Plaintiff's job.

35. Plaintiff met with Killian during or around the week of June 17, 2023. Plaintiff had, up until this point, a very collaborative and collegial working relationship with Killian, and therefore felt comfortable speaking frankly with Killian about the basis for Plaintiff's request for reasonable accommodation and the specific reason Plaintiff required Killian's assistance to clarify the essential functions of Plaintiff's job.

36. Plaintiff's job description did not specify that "time management", "communication style", "attention to minute detail", or other of the subjective traits of Cragun's harassment, were essential functions of Plaintiff's job. It was Plaintiff's intent, should these in fact be essential functions of Plaintiff's job, to request specific examples of and training on them, as a reasonable accommodation. If, however, these were not essential functions of Plaintiff's job, Plaintiff's request for reasonable accommodation would be to

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 8

formally ask Cragun to stop criticizing and harassing Plaintiff about them. Plaintiff told Killian verbally about these two options during the June 17, 2023 meeting.

37. Much to Plaintiff's confusion and dismay, Killian appeared to have no understanding of the responsibilities of an ADA Coordinator or of the dynamics of the interactive process. Though Plaintiff attempted to explain to Killian why Plaintiff would not be able to approach Cragun to get the required clarification of the essential functions of Plaintiff's job, Killian did not and would not acknowledge the responsibility of the ADA Coordinator to assist Plaintiff in securing this clarification. The meeting became awkward, and Plaintiff ended it by telling Killian that Plaintiff had an upcoming medical appointment on July 10, during which Plaintiff would seek her medical provider's input on the matter.

38. Plaintiff's medical provider, like Plaintiff herself, was not able to connect the essential functions listed in Plaintiff's job description with any of the traits about which Cragun harassed Plaintiff.

39. In the weeks between the June 17, 2023 meeting with Killian and the July 10, 2023 medical appointment, Plaintiff received several inquiries from Killian asking if Plaintiff had determined what accommodation(s) were necessary. Plaintiff reminded Killian that because Plaintiff had not and would not be able to clarify the essential functions of Plaintiff's job on Plaintiff's own, Plaintiff had not yet been able to finalize the accommodation request.

40. Cragun scheduled a meeting with Cragun, Ball, and Plaintiff during or about the last week of June 2023. Cragun's tone and manner during this meeting was conciliatory, cooperative, and even humble. Plaintiff left the meeting cautiously optimistic that no further harassment on the basis of Plaintiff's disability would be perpetuated by Cragun. Following this meeting, and due to Killian's inability or refusal to conduct an effective interactive process, Plaintiff notified Killian in mid-July 2023 that Plaintiff would not submit a request for accommodation.

41. Beginning in July 2023 through December 15, 2023, Cragun systematically removed job responsibilities from Plaintiff and reassigned them to unqualified, untrained, junior staff members, all of whom were younger than Plaintiff.

42. On Monday, November 13, 2023, Plaintiff was notified by a manager within LS ("DF", a peer of Cragun's) that a staff member reporting to DF had given DF a constructive request for reasonable accommodation

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 9

that morning. Plaintiff knew that DF was to attend a training session later that same day for all supervisors and managers within the legislative branch which would include an overview of reasonable accommodations, the interactive process, and other related subjects. Plaintiff therefore asked DF to wait until after the training to discuss a response to the constructive request for accommodation, to which DF agreed.

43. The November 13 training was given by a well-known shareholder attorney from the Salt Lake City branch of a regional law firm who specializes in employment law, and was titled "10 Ways Managers Get Their Organizations in Trouble".

44. On or about November 14, Plaintiff contacted the employee ("JM") who submitted the constructive request for accommodation to schedule a meeting to discuss next steps. That meeting was held on or about the same day.

45. Plaintiff conducted a fully compliant and effective interactive process with JM over approximately the following 10 days. Using information received from JM, JM's medical provider, and DF, Plaintiff determined that a 6-week accommodation during which JM would work remotely part-time, specifically 2 weekdays per week on which few if any legislative staff normally worked onsite, with the remaining 3 work days being in the office, was reasonable and appropriate. This accommodation was to begin on Monday, December 4, 2023, and would end just before the start of the 2024 legislative session, as all legislative staff were required to work onsite during the entirety of each general legislative session. JM reacted to this short-term accommodation with relief and gratitude, and assured Plaintiff that this would undoubtedly and unquestionably allow him to perform the essential functions of his job not only during the 6-week accommodation period, but also beyond it.

46. On December 1, 2023, Plaintiff requested a meeting with DF to discuss the accommodation. DF immediately declined the meeting request but phoned Plaintiff to make clear his displeasure that Plaintiff had discussed the 6-week accommodation with JM prior to receiving DF's approval to do so.

47. On Monday, December 4, 2023, Plaintiff attended a meeting with Cragun and Killian scheduled to discuss the sequence of events beginning with JM's constructive request for accommodation up to and including the phone call from DF the previous Friday. Plaintiff described in detail each step taken by Plaintiff. There

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 10

was no visible disagreement or concern displayed or expressed by either Cragun or Killian. The meeting ended with Cragun and Killian agreeing that the three of them should meet with DF later that day.

48. Later on December 4, 2023, Cragun, Killian, and Plaintiff gathered in Cragun's office. DF joined the meeting virtually. DF remained vehemently opposed not only to the proposed 6-week accommodation for JM, but to any and all accommodation for JM. Recalling that Plaintiff, Cragun, Killian, and DF had all attended the November 13, 2023 training session during which a scenario essentially identical to this one had been considered and discussed, Plaintiff was surprised to witness Cragun and Killian agree with DF that no accommodation should be extended to JM. Plaintiff momentarily hesitated to agree because Plaintiff knew this withdrawal and denial was potentially unlawful, but out of an abundance of fear for the safety of Plaintiff's own employment, Plaintiff ultimately did as she was ordered.

49. Late in the afternoon of Thursday, December 14, 2023, Plaintiff received a meeting request from Cragun titled "HR Meeting" for 8:30 a.m., in person, the following morning. Because this was highly unusual, Plaintiff opened the invitation to determine who else was invited, knowing that if other HR staff were included, the meeting would be routine, but if any or all of Killian, Cannon, or Ashby were included, the meeting was undoubtedly for the purpose of terminating Plaintiff's employment. In fact, all three were listed on the invitation. Plaintiff knew that the unnecessarily high number of participants as well as who the participants were was intended as one final opportunity for Cragun to intimidate, punish, embarrass, and harass Plaintiff. Rather than knowingly subject herself to this, Plaintiff "replied all" to the effect that Plaintiff assumed the meeting's purpose was to terminate Plaintiff's employment and asking to arrange a mutually convenient time for Plaintiff to return LS property then in Plaintiff's possession and retrieve Plaintiff's personal belongings from the office.

50. On the evening of December 16, 2023, Plaintiff received an email from Cragun confirming the termination of Plaintiff's employment effective December 15, 2023. Cragun's message indicated that Plaintiff had two choices: Plaintiff could either sign the Severance Agreement & Release of Claims (the "Agreement") attached to the message in exchange for approximately 45 days of salary and benefits continuation, or Plaintiff could refuse to sign the Agreement, in which case Plaintiff would receive nothing other than wages earned but as yet unpaid through the date of termination.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 11

51. Plaintiff is informed and believes that the pretextual reason given by Cragun for Plaintiff's involuntary termination was that Plaintiff had failed to follow the legislative branch's internal ADA policy in the JM matter. In fact, Plaintiff was never trained on, nor was Plaintiff ever made aware of any such policy.

52. Plaintiff conducted a fully compliant and effective interactive process in response to JM's constructive request for reasonable accommodation, and at no time nor in any way did Plaintiff violate any part of any federal or state law while so doing.

53. To Plaintiff's knowledge and belief, a majority of the members of LSMC were required to approve the decision to terminate Plaintiff's employment on an involuntary, for-cause basis for that termination to be effected.

54. In part or in full, two members of LSMC had enabled or participated in Cragun's ongoing harassment of Plaintiff, namely Cannon and Ashby. At the time of Plaintiff's involuntary termination of employment, another three members of LSMC were fully (namely, Minchey and Ball) or partially (namely Thomas), aware of Cragun's ongoing harassment of Plaintiff, as Plaintiff had regularly and repeatedly reported this harassment to each of them and all of them during the previous six months.

55. To Plaintiff's knowledge and belief, up to and including December 15, 2023, besides Plaintiff no other similarly situated legislative branch employee had been forced or even asked to sign any similar conditional Severance Agreement & Release of Claims. In each and every previous similar circumstance, the employee whose employment was terminated involuntarily or was otherwise "managed out" was simply unconditionally given various amounts of salary and benefits continuation ranging from 2 weeks to 12 weeks. In Plaintiff's professional judgement, the attempt by Cragun, Killian, Cannon, and Ashby to force Plaintiff to sign a conditional Agreement was one final discriminatory act perpetuated against Plaintiff.

56. Plaintiff later received pay for wages earned through December 14, 2023. Plaintiff did not then nor since receive pay for December 15, 2023, the effective date of the involuntary termination.

57. On Saturday, December 16, Plaintiff submitted an Inquiry to the Phoenix District Office of the Equal Opportunity Employment Commission ("EEOC").

58. Also on Saturday, December 16, 2023, Plaintiff submitted an intake questionnaire to the Utah Antidiscrimination and Labor Division ("UALD").

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 12

59. As Plaintiff had, at the time she received Cragun's December 16, 2023 email, already constructively violated the Agreement, Plaintiff did not then or since sign the Agreement.

60. On or about December 22, 2023, Plaintiff received information and believes that the job made open by Plaintiff's involuntary termination days earlier had been filled without a job announcement or standard recruiting process. The candidate offered the job, who began work on or about December 27, 2023, was then and likely remains wholly unqualified to perform the job of Senior Human Resources Consultant, and was as of that time approximately 31 years of age.

61. Plaintiff received notice from the UALD on or about February 23, 2023, that Plaintiff's Charge of Discrimination had been filed under UALD No. C4-0321 and EEOC No. 35C-2024-00321. Plaintiff immediately notified the UALD via email that the Charge of Discrimination should be amended to include an additional charge of age discrimination.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### WORKPLACE DISCRIMINATION, HARASSMENT & HOSTILE WORK ENVIRONMENT BASED ON DISABILITY

62. Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

63. Plaintiff is a qualified individual with one or more disabilities within the meaning of the ADA, 42 U.S.C. §§12102(1), and was able to perform the essential functions of her job with or without reasonable accommodation.

64. Defendant Cragun subjected Plaintiff to severe and pervasive harassment as alleged above, which was based solely on Plaintiff's disabilities.

65. Defendant Cragun knew or should have known Cragun's conduct amounted to unlawful harassment, yet failed to stop.

66. At least two of Cragun's superiors knew or should have known about Cragun's harassment of Plaintiff and failed to take prompt or any corrective action.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 13

67. The harassment Plaintiff suffered was causally connected to Plaintiff's disabilities and was not based on job performance or any legitimate occupational qualification.

68. As a direct and proximate result of Cragun's unlawful conduct, Plaintiff suffered and continues to suffer mental and emotional distress, humiliation, loss of professional reputation, and other compensible harm.

69. Plaintiff is entitled to any and all remedies available, including back pay and benefits, front pay and benefits, compensatory damages, costs, attorney fees if and when incurred, and injunctive relief.

## SECOND CAUSE OF ACTION:
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE UTAH ANTIDISCRIMINATION ACT

70. Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

71. Plaintiff is a qualified individual with one or more disabilities within the meaning of the ADA, 42 U.S.C. §§12102(1), and was employed by Defendant LS at all relevant times.

72. Defendant LS is an "employer" as defined by 42 U.S.C. §§12111(5)(A), and is subject to the requirements of the ADA.

73. Defendant Cragun and Defendant Killian were aware of Plaintiff's disabilities and the limitations they caused. Plaintiff disclosed her disabilities to Defendants Cragun and Killian and other agents of Defendant LS and made multiple good faith efforts to request reasonable accommodations that would not have imposed an undue hardship on Defendants.

74. Defendant Killian in particular failed to engage in a compliant or good-faith interactive process or to provide assistance required by Plaintiff to clarify the essential functions of Plaintiff's job as required under 29 C.F.R. §1630.2(o)(3). Instead, Defendant Killian ignored or deflected Plaintiff's requests; Defendant Cragun retaliated against Plaintiff, and each and all defendants took adverse employment actions including intensified scrutiny, removal of assigned job responsbilities, isolation from colleagues, and ultimately termination of employment.

75. The conduct of Defendant Cragun and Defendant Killian also violated Utah Code Ann. §34A-5-106(1)(g), which prohibits an employer from refusing to provide reasonable accommodation for a known disability.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 14

76. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer from loss of income, loss of career advancement, reputational harm, mental and emotional distress, and other compensable damages in an amount to be determined at trial.

77. Plaintiff is entitled to all legal and equitable relief available under the ADA, including but not limited to back pay and benefits, front pay and benefits, compensatory damages, attorney fees if and when incurred, and injunctive relief.

## THIRD CAUSE OF ACTION:

## RETALIATION BASED ON DISABILITY

78. Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

79. Plaintiff is a qualified individual with one or more disabilities within the meaning of the ADA, 42 U.S.C. §§12102(1), and was employed by Defendant LS at all relevant times.

80. Defendant LS is an "employer" as defined by 42 U.S.C. §§12111(5)(A), and is subject to the requirements of the ADA.

81. During Plaintiff's employment with Defendant LS, Plaintiff engaged in protected activity under the ADA by attempting to request reasonable accommodations for her disabilities, by performing her assigned job responsibilities as ADA Coordinator, by opposing practices made unlawful by the ADA, by communicating her concerns about practices made unlawful by the ADA to Defendant Cragun, Defendant Killian, and multiple other individuals in the most senior management positions within the legislative branch of Utah State Government.

82. Throughout Plaintiff's engagement in these protected activities, Plaintiff was subjected to adverse employment actions, including but not limited to unwarranted verbal and written criticisms, "jokes" made at Plaintiff's expense in the presence of others, inaccurate annual performance reviews including lower than earned ratings of Plaintiff's overall job performance, the ongoing removal of Plaintiff's assigned job responsibilities which were then reassigned to less qualified or unqualified, younger employees, multiple other attempts to humilate Plaintiff in front of others, multiple attempts to isolate Plaintiff from other LS employees, and the involuntary termination of Plaintiff's employment.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 15

83. Defendants Cragun, Killian, Cannon, and Ashby unlawfully terminated the employment of Plaintiff for asserting her rights and engaging in protected activities under the ADA.

84. Defendants Cragun, Killian, Cannon, and Ashby withheld salary and benefits continuation from Plaintiff following Plaintiff's unlawful termination, salary and benefits continuation which had previously normally and routinely been unconditionally given to all other similarly situated employees prior to December 15, 2023.

85. On Plaintiff's knowledge and belief, in or about January 2024, Defendant Ashby issued a written directive to all supervisors, managers, and leaders within the legislative branch of Utah State Government forbidding any and all of them from providing Plaintiff or Plaintiff's prospective employers with positive employment references.

86. On Plaintiff's knowledge and belief, in or about December 2023 to early 2024, Defendant Cragun shared details of the termination of Plaintiff's employment with hiring managers and others within the executive branch of Utah State Government. These efforts were intended solely to defame Plaintiff and thereby prevent Plaintiff from securing new employment within Utah State Government.

87. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer from loss of employment opportunities, mental and emotional distress, reputational harm, and other compensable damages.

Plaintiff is entitled to all remedies available, including but not limited to back pay and benefits, front pay and benefits, compensatory damages, attorney fees if and when incurred, and injunctive relief

## FOURTH CAUSE OF ACTION:
## WORKPLACE DISCRIMINATION BASED ON AGE

88. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

89. Plaintiff is a person protected by the ADEA by virtue of being over the age of 40 at all relevant times herein.

90. Defendant is an "employer" within the meaning of the ADEA (29 U.S.C. §§630(b)) and is subject to the requirements of that statute.

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 16

91. Following the unlawful termination of Plaintiff's employment, Defendants immediately filled Plaintiff's job without a job announcement or standard recruiting process and with a wholly unqualified individual approximately 31 years of age.

92. Defendants knew or should have known this conduct was unlawful under the ADEA. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered and continues to suffer lost wages and other benefits, mental and emotional distress, humiliation, loss of professional reputation, and other compensable damages.

93. Plaintiff is entitled to any and all remedies available, including back pay and benefits, front pay and benefits, compensatory damages, costs, attorney fees if and when incurred, and injunctive relief.

## FIFTH CAUSE OF ACTION:
## FAILURE TO PAY WAGES

94. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

95. Defendants were required by Utah Code § 34-28-5 to pay all wages earned and due to Plaintiff as of the date of the termination of her employment, December 15, 2023.

96. Despite this statutory obligation, Defendant failed to pay Plaintiff for work performed on the last day of her employment, December 15, 2023 in the amount of $416.00.

97. Defendants' failure to pay Plaintiff the entirety of her final wages constitutes a violation of Utah's Payment of Wages Act.

98. As a direct and proximate result of Defendants' failure to comply with Utah law, Plaintiff suffered financial harm and is entitled to all remedies provided under Utah Code §34-28-5 and §34-28-9, including the unpaid wages, statutory penalties, costs, and reasonable attorney fees if and when incurred.

## DEMAND FOR JURY TRIAL

Plaintiff requests that this matter be tried before a jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgement against each and all Defendants for:

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 17

1. Compensatory damages for all past, current, and future economic losses incurred by Plaintiff as a result of each and all Defendants' unlawful conduct;
2. General damages for all past and current mental and emotional distress suffered by Plaintiff as a result of each and all Defendants' unlawful conduct;
3. Punitive damages against the individual Defendants to the fullest extent permitted by law;
4. A declaration that each and all Defendants' actions violated the Americans with Disabilities Act, the Age Discrimination in Employment Act, Utah state laws corresponding to each of those statutes, and other Utah state law(s);
5. Costs incurred in this action and reasonable attorney fees, if and when incurred; and
6. Any further relief as may become apparent from discovery as this matter matures for trial.

Plaintiff hereby certifies that, in compliance with Federal Rule of Civil Procedure 11, this Action is not being filed for any improper purpose and is supported by existing law and factual contentions that have evidentiary support.

Dated this 18th day of June, 2025.

_Rebecca Owen_
Rebecca Owen, Plaintiff pro se

VERIFIED COMPLAINT FOR DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION, AGE DISCRIMINATION, AND FAILURE TO PAY WAGES - 18